UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHARLES SCURLOCK,<br><br>Plaintiff,<br><br>v.<br><br>PENTHOUSE INTERNATIONAL<br>ENTERTAINMENT CONSULTANTS IEC,<br><br>Defendant. | Case No. 15-cv-338-JPG-DGW |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for summary judgment filed by defendant IRC, LP ("IRC") (misnamed in the complaint as Penthouse International Entertainment Consultants IEC) (Doc. 49). Plaintiff Charles Scurlock has responded to the motion (Docs. 53 & 54), and IRC has replied to that response (Doc. 55). Scurlock has filed a sur-reply in response to IRC's reply (Doc. 56). Pursuant to Local Rule 7.1(c), which states, "Under no circumstances will sur-reply briefs be accepted," the Court disregards Scurlock's sur-reply brief.[1]

**I.   Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See*

---

[1] The Court has reviewed the information in Scurlock's sur-reply brief with an eye toward confirming that Magistrate Judge Donald G. Wilkerson was correct in his assessment that Scurlock is competent to represent himself. In other words, the Court was making sure that there was nothing material omitted from Scurlock's response brief but stated in his sur-reply brief that, had counsel been appointed and included that information in the proper brief, would have been properly brought before the Court. With the exception of the termination form for Scurlock's termination, the Court has found nothing in the sur-reply brief that would have been included in the response brief by competent counsel. The Court has considered that termination form.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

**II. Facts**

Construing the evidence and drawing all reasonable inferences in Scurlock's favor, the

evidence establishes the following relevant facts.

In April 2014, Scurlock began working as a receptionist host/private host/courtesy patrol person for IRC, which was doing business as the Penthouse Club. He worked the daytime shift Mondays, Tuesdays and Thursdays. At the time, IRC had an equal employment opportunity policy ("EEO policy") prohibiting, among other things, harassment and discrimination in the workplace based on race and age. The EEO policy further states:

> If an employee believes someone has violated this policy, the employee should bring the matter to the attention of any member of management. If you do not feel comfortable discussing your concerns with your Director, you may report your concern to Micheal Ocello at [email address], [telephone number], or [telephone number], or the Company's outside counsel, Allan Rubin, at [email address] or [telephone number]. The Company will promptly investigate the facts and circumstances of any claim this policy has been violated and take appropriate corrective measures.

EEO Policy, Employee Handbook 7 (Doc. 50-2 at 4). The EEO Policy also states:

> If anyone believes that he/she is or has been unlawfully discriminated against or has complaints of harassment, that person should report the alleged unlawful act to any member of management, Company President Micheal Ocello at [email address], [telephone number], or [telephone number], or the Company's outside counsel, Allan Rubin, at [email address] or [telephone number]. Any complaint of harassment or discrimination should be brought to a management level employee above the level of the person who is the subject of the Complaint. To the extent possible, the Company will attempt to keep all reports of harassment or discrimination confidential on a need-to-know basis. Upon receipt of any complaint of harassment or discrimination, the Company will within a reasonable amount of time commence an investigation into the allegations and, where appropriate, take prompt and effective remedial action, either on an interim or permanent basis, reasonably designed to eliminate the harassment or discrimination and prevent recurrences. Such action may include discipline or discharge of the harasser or discriminator.

EEO Policy, Employee Handbook 10 (Doc. 50-2 at 7). Scurlock had a copy of IRC's Employee Handbook containing the EEO policy and was familiar with that policy.

Scurlock is African-American and was fifty years old when he was hired. Jim Lindsey interviewed Scurlock, hired him, and was his immediate supervisor. From the beginning, Lindsey

3

called Scurlock "stupid," "dumb," "special," or "old" every time they worked the same shift. Specifically, he called him old "a lot of times" beginning in May 2014. Scurlock Dep. at 72:22-23 (Doc. 50-1 at 35).

After finishing his shift at the Penthouse Club on November 20, 2014, Scurlock went home to eat, change clothes and relax. Early the next morning, he returned to the area to patronize Pop's Nightclub, which was near the Penthouse Club. In the early morning of November 21, 2014, Scurlock got into a dispute with a bouncer at Pop's, the bouncer called the police, and the police asked Scurlock to leave the premises. Outside in the parking lot, Scurlock ran into Larry Scott, one of Scurlock's coworkers at the Penthouse Club. Scott screamed to Scurlock, "N——r [racially derogatory term], you been written up," Scurlock Dep. at 41:13 (Doc. 50-1 at 18), and then walked back into the Penthouse Club. Up to that point, no one at the Penthouse Club had ever called Scurlock that racially derogatory name.[2]

Later in the morning of November 21, 2014, Scurlock texted Lindsey to ask him why he was being written up. Lindsey then called Scurlock, and Scurlock told him about his encounter with Scott, including his use of the racially derogatory term, and complained about the names Lindsey had called him, including "old." Lindsey told Scurlock that he was not being written up and that he

---

[2] In his response to IRC's summary judgment motion, Scurlock denies IRC's statement of fact that he had never been called that racially derogatory name on other occasions. The Court disregards this portion of Scurlock's response because it contradicts his clear deposition testimony without any plausible explanation of the contradiction. Scurlock Dep. at 60:11-14 (Doc. 50-1 at 27). The law is well-established that "in general, parties may not 'patch-up potentially damaging deposition testimony' with a contradictory affidavit." *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs.*, 259 F.3d 792, 799 (7th Cir. 2001)(citing *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999)). "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995))); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 919 n. 4 (7th Cir. 2001). The Court will consider a contradictory affidavit if the declarant satisfactorily explains the discrepancy in the testimony. *Commercial Underwriters*, 259 F.3d at 799.

should return to work. Scurlock said he would not return to work until something was done about the name-calling. Lindsey said he could not do anything about Scott's name-calling but promised that this would never happen again. Scurlock told Larry he wanted to talk to another manager first, one that was over the level of Lindsey.

Lindsey called Scurlock again the following day, November 22, 2014, and asked him to return to work, but again Scurlock said he wanted to talk to another supervisor – one over Lindsey – before returning to work.

Scurlock called Rich Westerheide, a management level employee Scurlock had gone to on other occasions when he had had problems at work. Westerheide was not there when he called, so Scurlock talked to Rich Overstreet, who was higher than Lindsey in management. He told Overstreet about the names Lindsey and Scott had called him and that he wanted something done about it. Overstreet said he would investigate the situation and get back to Scurlock.[3]

Following his phone conversations with Lindsey and Overstreet, Scurlock came away with the impression he had been fired, so he did not return to work. Scurlock never heard anything more from Overstreet.[4]

---

[3] There is some suggestion the manager Scurlock spoke with was not Overstreet but someone else whose name Scurlock did not remember. The identity of the manager, however, is not material to the resolution of this motion.

[4] In Scurlock's response to IRC's summary judgment motion, he states that he did not return to work because he was fired on November 22, 2014, in a phone conversation. However, in his sworn statement in his Illinois Department of Human Rights charge, he stated that he refused to come back until something was done about the harassment and that he was constructively discharged because no action was taken to prevent further harassment. Furthermore, there is no evidence either Lindsey or Overstreet told Scurlock he was fired. In fact, Scurlock testified that Lindsey encouraged him to come back to work, and Overstreet promised to conduct an investigation and get back to him. In light of Scurlock's sworn statement in his charge of discrimination regarding the reason he did not come back to work and his deposition testimony regarding the content of his phone calls with Lindsey and Overstreet, the Court will not credit his affidavit testimony that he was fired in a phone call on November 22, 2014. As noted in footnote 1, without an explanation of these contradictory statements, the Court need not consider the attempt to patch up Scurlock's prior statements with his affidavit.

On November 23, 2014, Lindsey sent a text to Scurlock asking whether he would be at work Monday and Tuesday. Scurlock did not show up for his scheduled shift on November 24, 2017, the first day he was scheduled to work after the incident with Scott. On December 3, 2014, IRC determined that Scurlock had quit his job and recorded the termination of his employment as a "voluntary termination" due to his failure to report for work. Scurlock has not worked since that time.

Scurlock exhausted his administrative remedies and filed this lawsuit on March 27, 2015. He alleges IRC discriminated against him on the basis of his race and age and that the discrimination resulted in his constructive discharge.

**III. Analysis**

In its summary judgment motion, IRC argues that Scurlock cannot prove he was subject to a hostile environment on the basis of his race because he only points to one use of a derogatory term in the workplace and, similarly, cannot prove he was subject to a hostile environment based on age because the Lindsey's calling him "old" was not sufficiently severe or pervasive to support a cause of action. IRC further argues that, even if the environment were hostile on the basis of an impermissible factor, it is entitled to an affirmative defense because it was reasonably diligent in preventing or correcting any harassing behavior and because Scurlock did not make use of IRC's corrective procedures. As for Scurlock's claim of constructive discharge, IRC argues that the conditions of Scurlock's employment were not severe enough to support a constructive discharge claim.

    A.    <u>Race Discrimination</u>

        1.    <u>Hostile Environment</u>

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits discrimination

on the basis of race: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). The race discrimination prohibited by Title VII includes racial harassment that creates a hostile work environment. *See Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004).

A hostile work environment is created by conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). To prevail on a racially hostile work environment claim, a plaintiff must establish "(1) that [his] work environment was both objectively and subjectively offensive; (2) that the harassment was based on [his] race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability. *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011), *aff'd*, 133 S. Ct. 2434 (2013); *accord Lambert v. Peri Formworks Sys.*, 723 F.3d 863, 868 (7th Cir. 2013).

Determining whether conduct is sufficiently severe or pervasive to constitute an objectively hostile working environment is not an easy task. It must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993) (further internal quotations omitted)); *accord Lambert*, 723 F.3d at 868. "[H]arassing conduct does not need to be both severe and pervasive. One instance of conduct that is sufficiently severe may be enough." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (internal citations omitted). However, "simple

7

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotations and citations omitted).

For example, the Seventh Circuit Court of Appeals has found that calling a plaintiff "'boy,' 'black n——r,' and treat[ing] him harshly" was not enough to withstand summary judgment on a hostile work environment claim. *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600, 601 (7th Cir. 2014). The Court of Appeals noted, "[W]hile referring to colleagues with such disrespectful language is deplorable and has no place in the workforce, one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability." *Id.* In contrast, the Court of Appeals has found summary judgment not warranted where there was evidence that the plaintiff's coworkers and supervisors directed a highly offensive racial epithet toward him on multiple occasions, in a context where coworkers also openly advocated for white supremacy movements and wrote racially offensive graffiti on the bathroom walls. *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005). In another case, the Court of Appeals found the plaintiff's case barely sufficient to withstand summary judgment where a top manager referred to certain workers as "donkeys" in his presence at least five times over four years and called an African-American coworker a "gorilla," and that another supervisor told the plaintiff, while he was yelling and screaming at the plaintiff, that he did not respect him because he was a "n——r." *Lambert*, 723 F.3d at 865.

Scurlock has pointed to no harassment based on race other than Scott's one time calling him a racially derogatory term. For the same reasons cited in *Nichols*, the Court finds that Scurlock cannot establish such a claim based on Scott's one-time use of a derogatory term. While the term he used is deeply offensive and was aimed directly at Scurlock, it was uttered once by a IRC employee who was

not in Scurlock's chain of command, outside of work hours and outside of the workplace. No reasonable jury could find Scott's one statement was sufficiently severe or pervasive to create an objectively hostile work environment for Scurlock that effectively altered the terms and conditions of his employment.

Because no reasonable jury could find Scurlock was subject to a hostile work environment based on his race, there is no need to consider whether IRC is subject to liability for such a hostile environment. IRC is entitled to summary judgment on this claim.

    2.    Constructive Discharge

Furthermore, Scurlock cannot prevail on a claim that he was constructively discharged because of a racially hostile work environment. To establish a constructive discharge claim, the plaintiff must show "that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The plaintiff must demonstrate that working conditions were more egregious than those required to prove a hostile environment claim. *Id.* Since Scurlock has not pointed to any evidence that could establish a racially hostile work environment, he also cannot establish the intolerable conditions necessary to support a constructive discharge claim. IRC is entitled to summary judgment on this claim.

    B.    Age Discrimination

        1.    Hostile Environment

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, prohibits discriminating against an individual who is at least 40 years old with respect to the terms of his employment based on the individual's age. 29 U.S.C. §§ 623(a) & 631(a). The Seventh Circuit Court of Appeals has assumed that such a prohibition includes a hostile work environment claim

based on age. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005). IRC contends the age-based conduct to which Scurlock was subject was not severe or pervasive enough to create an objectively hostile working environment.

The standard for determining whether a work environment is hostile under the ADEA is the same as under Title VII. *See, e.g., Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

Taking into account all the circumstances, the Court finds that a reasonable jury could find Scurlock was subject to conduct that was sufficiently severe or pervasive that it constituted an objectively hostile work environment on the basis of his age. While Lindsey's calling him old was not severe, it was pervasive. It occurred every day that Scurlock was at work with Lindsey from May to November 2014, and it was directed at him in his presence. Additionally, Lindsey paired the term with other terms like dumb, stupid and special, and used "old" to indicate Scurlock lacked intellectual capacity. He also called him old in front of other employees or supervisors, which was humiliating to Scurlock. While this is a close call, the Court believes a reasonable jury could find Lindsey's conduct created an objectively hostile work environment based on age.

2. Constructive Discharge

Scurlock cannot prevail on a claim that he was constructively discharged because of a hostile work environment based on his age. As with a race-based constructive discharge claim, a plaintiff seeking to prove an age-based constructive discharge claim must show more than simply a hostile work environment. He must show that his working conditions were so intolerable that a reasonable person would have felt compelled to resign. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001); *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). "Absent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress. . . . [A]n

employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Grube v. Lau Indus.*, 257 F.3d 723, 728 (7th Cir. 2001) (internal citations and quotation marks omitted); *accord Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004).

While the age-related names Lindsey called Scurlock were certainly unpleasant and insulting, no reasonable jury could find their use created a work environment that was intolerable such that he was compelled to resign. Additionally, once Scurlock reported Lindsey's conduct to Overstreet, Scurlock did not remain on the job long enough to give IRC a reasonable chance to investigate his complaint and resolve the issue. Instead, he announced several times that he would not return until something was done about the harassment and, indeed, he did not return. In these circumstances, no reasonable jury could find Scurlock was constructively discharged.

      3.      <u>Employer Liability</u>

Invoking what has become known as the *Faragher-Ellerth* affirmative defense, IRC argues that it cannot be liable for an age-based hostile work environment because it was reasonably diligent in preventing and correcting the harassment and because Scurlock did not follow the proper procedure for reporting harassment.

Where the harasser was the plaintiff's supervisor, the employer is generally vicariously liable for an actionable hostile environment created by a supervisor with authority over the victimized employee. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). However, if the employer did not take any tangible employment action against the employee, the employer may raise the *Faragher-Ellerth* affirmative defense to liability or damages. *Pennsylvania State Police v. Suders,* 542 U.S. 129, 143 (2004); *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. 765. To succeed in its affirmative defense, the employer must show that

(1) that it exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by his employer or to otherwise avoid harm. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Passananti v. Cook Cty.*, 689 F.3d 655, 670 (7th Cir. 2012).

The *Faragher-Ellerth* defense may be available to IRC because it took no tangible employment action against Scurlock. In order to establish a tangible employment action, a plaintiff must show a "quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003); *see Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002). "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act." *Ellerth*, 524 U.S.at 762. However, "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (internal quotations, citations and ellipsis omitted). Actions that do not significantly affect a plaintiff's job responsibilities or benefits, or actions that cause mere inconveniences, cannot be tangible employment actions. *Id.*.

As the Court has noted above, there is evidence that Scurlock believed IRC terminated him in a phone conversation with either Lindsey or Overstreet on November 22, 2014. However, he did not raise a termination claim in his complaint other than in the form of constructive discharge, which the Court has determined he cannot prove. Additionally, no reasonable jury could find IRC actually terminated Scurlock in either phone conversation. Scurlock testified that Lindsey told him to come back to work and that he would not get written up. Lindsey also sent him a text message the

following day asking if he was going to report to work as scheduled. Scurlock also testified that Overstreet said he would investigate Scurlock's complaints and then get back to him. Scurlock told both men that he would not return until something was done about the harassment, and then he failed to show up for his next scheduled shift. In light of these facts, the Court believes no reasonable jury could find Scurlock was involuntarily terminated. While IRC determined that Scurlock voluntarily quit by not showing up to work on the next day he was scheduled to work, Scurlock has not alleged that that determination was because of his age or race or that it was in retaliation for his complaints. Thus, that employment status determination is not in issue in this case.

The Court has already determined that IRC did not constructively discharge Scurlock by creating working conditions that were intolerable and that would make a reasonable employee feel compelled to quit. There is no evidence of any other possible "quantitative or qualitative change in the terms or conditions of his employment" that would constitute a tangible employment action. Thus, IRC may be able to take advantage of the *Faragher-Ellerth* defense.

The evidence shows IRC was reasonably diligent in preventing harassing behavior. Merely having a sexual harassment policy is not enough, by itself, to establish the first element of the *Faragher/Ellerth* defense. *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 953 (7th Cir. 2005). However, the promulgation and use of a policy can show that an employer took reasonable care to prevent harassment. *Id.*; *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999). Here, IRC had an EEO policy providing multiple channels of reporting harassment – any member of management, IRC's president or its outside counsel – and provided multiple specific methods of contacting the president and outside counsel. It educated its employees about the policy sufficiently that Scurlock knew that under the policy he should report harassment to a management level employee. In fact, when Scurlock had other problems (not the harassment at issue in this case), he felt free to contact

Rich Westerheide, a member of management, and he reached out to Westerheide in this case, although unsuccessfully. No evidence suggests IRC's written policy was not carried out in practice and was, in fact, just a sham. In fact, when Scurlock eventually observed the policy by calling a member of management above Lindsey's level, Overstreet informed him he would begin an investigation of the complaints and would get back to him.

The evidence also shows IRC was reasonably diligent in responding to Scurlock's complaints to correct any harassment. As noted above, when Scurlock complained, Overstreet, informed Scurlock he would begin an investigation. No evidence suggests Overstreet did not commence, or would not have commenced, an investigation in a reasonable period of time had Scurlock not quit. Once Scurlock stopped coming to work, there was no further need to pursue corrective measures to protect him from harm.

Finally, there is the question of whether Scurlock unreasonably failed to take advantage of any corrective opportunities provided or to avoid harm. There is no evidence Scurlock complied with IRC's EEO policy by complaining to a member of management above Lindsey's level, or to outside counsel, about Lindsey's age-based harassment before November 22, 2014, when he talked to Overstreet. No evidence supports the conclusion that this failure to report Lindsey's conduct pursuant to the EEO policy was reasonable.

In sum, based on the evidence presented, no reasonable jury could find that IRC did not exercise reasonable care to prevent or correct age harassment or that Scurlock took advantage of the preventive or corrective opportunities available to him through the EEO policy. Accordingly, IRC is entitled to the protection of the *Faragher-Ellerth* affirmative defense for Scurlock's age-based hostile environment claim. The Court will therefore grant summary judgment to IRC on this claim.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** IRC's motion for summary judgment (Doc. 49) and **DIRECTS** the Clerk of Court to enter judgment accordingly. This renders **MOOT** Scurlock's motion to change venue (Doc. 57) in which he asks the Court to hold proceedings in the courthouse in East Saint Louis, Illinois, rather than Benton, Illinois. Since summary judgment is granted, there will be no trial.

**IT IS SO ORDERED.**
**DATED: May 10, 2017**

                                                s/ J. Phil Gilbert
                                                **J. PHIL GILBERT**
                                                **DISTRICT JUDGE**